IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| Plaintiff, | ) ) Case No. _____ |
| v. | ) ) ) |
| GRAHAME RHODES, | ) ) |
| Defendant. | ) ) |

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT**

### I. SUMMARY

1. Since at least 2001 to the present, Grahame Rhodes ("Rhodes" or "Defendant") has operated a Ponzi scheme through which he has defrauded, deceived, and stolen funds from his family and friends. Throughout the duration of his over a decade-long Ponzi scheme Rhodes – who has never registered with the United States Commodity Futures Trading Commission ("CFTC" or "Commission") in any capacity – misappropriated at least $2.1 million from at least 12 individuals (the "pool participants") for the supposed purpose of trading commodity futures in a pooled investment account ("non-existent pool"). Of the total $2.1 million that he obtained throughout the operation of his Ponzi scheme, Rhodes obtained at least $1.27 million, from at least five pool participants, from August 1, 2007 through the present (the "Relevant Period").

2. Rhodes did not deposit any of the pool participant funds he collected during the Relevant Period into the non-existent pool or even a trading account. Instead, he

misappropriated the funds and used them to pay for his personal expenses, including payments for luxury cars, credit card bills, private school tuition, and mortgage payments. Rhodes also used the funds he collected from the pool participants to pay fictitious profits to other pool participants in the manner of a Ponzi scheme.

3. To conceal his Ponzi scheme, during the Relevant Period, Rhodes made false representations on multiple occasions to at least two pool participants concerning their returns and/or gains on their principal funds and the value of their shares of the pooled funds. Rhodes also forged an account statement depicting that he held at least $3.4 million in his trading account and provided this forged statement to at least one pool participant.

4. By dint of this conduct and the conduct further described herein, Rhodes has engaged, is engaging, or is about to engage in acts and practices in violation of provisions of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1 *et seq.* (2006 & Supp. IV 2011), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008), §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008), and the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), Pub. L. No. 111-203, §§ 701-774, 124 Stat. 1376, 1641 *et seq.* (effective July 16, 2011), and the Commission's Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2012), specifically Sections 4m(1) and 4*o*(1)(A) and (B) of the Act, 7 U.S.C. §§ 6m(1) and 6*o*(1)(A) and (B) (2006), and Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2012).

5. Accordingly, pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1 (2006 & Supp. IV 2011), the Commission brings this action to enjoin Defendant's unlawful acts and practices and to compel compliance with the Act, as amended, and Commission Regulations.

6. In addition, the Commission seeks civil monetary penalties and remedial ancillary

relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

7. Unless restrained and enjoined by this Court, Rhodes is likely to continue to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as described more fully below.

## II. JURISDICTION AND VENUE

8. This Court possesses jurisdiction over this action pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1 (2006 & Supp. IV 2011), which authorizes the Commission to seek injunctive and other relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

9. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006), because Rhodes resides in this District and the acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District.

## III. THE PARTIES

10. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act, as amended, and the Commission Regulations promulgated thereunder. The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

11. Defendant **Grahame Rhodes** resides in St. Louis, Missouri. He created, owns, and operates Lincolnshire Trading LLC ("Lincolnshire"). Rhodes formed Lincolnshire as a

3

Missouri limited liability company on October 7, 2004, for the stated purpose of holding his personal investments. He also has acted as a commodity pool operator ("CPO") without ever having been registered with the Commission as a CPO or in any other capacity.

### IV.   STATUTORY BACKGROUND

12.   A "commodity pool" is defined in Commission Regulation 4.10(d)(1), 17 C.F.R. § 4.10(d)(1) (2012), as any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading commodity interests.

13.   Prior to July 16, 2011, Section 1a(5) of the Act, 7 U.S.C. § 1a(5) (2006), defined a "commodity pool operator" as any firm or individual engaged in a business which is of the nature of an investment trust, syndicate, or similar form of enterprise, and that, in connection therewith, solicits, accepts, or receives from others funds, securities, or property, either directly through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market. Upon the effective date of Title VII of the Dodd-Frank Act on July 16, 2011, the definition of a CPO was expanded and re-designated in Section 1a(11) of the Act, as amended, 7 U.S.C. § 1a(11) (2006 & Supp. IV 2011).

14.   A pool "participant" is defined in Commission Regulation 4.10(c), 17 C.F.R. § 4.10(c) (2012), as any person who has any direct financial interest in a commodity pool.

15.   Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2012), provides that no CPO "may commingle the property of any pool that it operates or that it intends to operate with the property of any other person."

4

## V.   FACTS

### A.   Rhodes Made False and Misleading Representations to Pool Participants

16.   Since at least 2001, Rhodes falsely presented himself to potential pool participants as a successful day trader who earned his livelihood solely through his trading activities in E-mini S&P 500 futures contracts. However, during the Relevant Period, Rhodes rarely placed any trades. Specifically, the total trading conducted by Rhodes across the Relevant Period consisted of 108 E-mini S&P 500 futures contracts on 24 individual trading days. All of these trading positions were opened and closed during the same trading day. Most of these trades lost money.

17.   Rhodes solicited the prospective pool participants, specifically targeting his family and friends, by pretending to be a successful, but cautious, trader who earned annual rates of return ranging between 20 and 50 percent through his trading of E-mini S&P 500 futures contracts. For example, prior to accepting his funds, Rhodes told one pool participant that he averaged a 30 percent annual rate of return from his trading. In reality, Rhodes had never achieved the rates of return he represented to potential pool participants.

18.   Under the terms of the fund management agreement ("Agreement") Rhodes entered into with pool participants, Rhodes had full discretionary authority to manage the funds in a trading account he controlled. Rhodes told pool participants that their money would be pooled with other pool participant funds. Under the terms of the Agreement, after one year, a pool participant was guaranteed the full return of his or her original principal. If the fund earned a profit, then the pool participant would receive his or her principal plus the profit. The Agreement was renewable on an annual basis.

19.   During the Relevant Period, Rhodes entered into an Agreement with at least one pool participant. In 2008, Rhodes accepted additional funds from at least two other pool

participants who had previously executed an Agreement with him prior to the beginning of the Relevant Period.

20. During the Relevant Period, Rhodes and his then wife obtained power of attorney over his then mother-in-law's financial affairs due to her deteriorating health. Rhodes has admitted that he facilitated the transfer of approximately $455,854 of his then mother-in-law's money, including the proceeds of the sale of her home, to Lincolnshire or himself for the purported purpose of pooling her money with the pool participant funds for trading E-mini S&P 500 futures contracts. Rhodes never deposited these funds into a trading account and instead misappropriated them.

21. During the Relevant Period, Rhodes routinely made misrepresentations to pool participants. For example, Rhodes made claims to various pool participants that he was an active day trader whose work day was consumed with high levels of profitable trading activity, and Rhodes made statements to pool participants that their funds were being used to fund open futures positions. Rhodes has admitted that, in reality, he had only generated a few thousand dollars in profits over the course of the fifteen years he had been trading commodity futures contracts, contrary to his false representations concerning his supposed high historical annual rates of return and supposed large historical profits that he touted to pool participants during the Relevant Period. Pool participants would have found it important to learn that the above-described statements were false because had they known the truth they would have asked for their funds to be returned to them.

22. During the Relevant Period, Rhodes made misrepresentations to at least two pool participants concerning the value of their share of the non-existent pool. Specifically, in January 2009, Rhodes sent an e-mail jointly addressed to "Pool Participant A," who provided $99,000 to

6

Rhodes for him to contribute to the non-existent pool during the Relevant Period and had previously contributed $100,000 for the same purpose prior to the Relevant Period, stating that the value of her share of the non-existent pool was $306,658, and to "Pool Participant B," who had contributed $74,000 to Rhodes for him to contribute to the non-existent pool during the Relevant Period and had previously contributed $75,000 for the same purpose prior to the Relevant Period, stating that the value of his share of the non-existent pool was $283,077.42. In this same joint e-mail, Rhodes also represented to "Pool Participant A" and "Pool Participant B" that he had earned a 35.1% annual rate of return from his 2008 trading. In reality, Rhodes engaged in little trading in 2008, "Pool Participant A's" and "Pool Participant B's" share of the non-existent pool had not grown at all, and Rhodes had not earned a 35.1% rate of return. "Pool Participant A" and "Pool Participant B" would have found it important to learn that the above-described statements were false because had they known the truth they would have asked for their funds to be returned to them.

23. After several pool participants questioned Rhodes' ability to make distributions to them from the non-existent pool, Rhodes provided a forged trading statement to "Pool Participant C." The forged statement showed that as of February 3, 2012, Rhodes had at least $3.4 million in his Velocity Futures LLC ("Velocity") trading account. In reality, however, as of February 3, 2012, Rhodes' Velocity trading account contained only $44,541.82, and it had never contained a balance higher than $50,044.24 since Rhodes opened it on April 13, 2010.

24. As his Ponzi scheme continued to unravel and pool participants continued to demand repayment of their funds and warn Rhodes that they would report him to law enforcement authorities, Rhodes made a series of additional misrepresentations to pool participants.

7

25. In a February 4, 2012 e-mail sent to at least one pool participant, Rhodes claimed that he had opened and fully funded a "monster account" which "[would] produce more than enough to take care of the problem...." Rhodes has subsequently admitted "the problem" to which he was referring was the need to repay the pool participants their funds, and that no such "monster account" ever existed.

26. In a March 2012 e-mail to all pool participants, Rhodes claimed that he had lost 90% of a trading account when he inadvertently left a position open for two weeks, and that he was trying to obtain a statement that would prove the loss. In reality, no such loss had occurred, and consequently, no such statement ever existed.

**B.   Rhodes Misappropriated Pool Participant Funds**

27. During the Relevant Period, pool participants provided Rhodes with funds either by checks made payable to Rhodes or to Lincolnshire or through bank wire transfers to Rhodes' Bank of America account or Lincolnshire's Bank of America account. If pool participant funds were directly deposited into Lincolnshire's bank account, Rhodes would then transfer the funds into his personal bank account.

28. Although Rhodes obtained money from pool participants during the Relevant Period for the purpose of trading E-mini S&P 500 futures contracts on their behalf, he did not deposit any of their funds into any trading account or conduct any trading activity with them. Instead, Rhodes misappropriated pool participant funds by, among other things, transferring pool participant funds from Lincolnshire's Bank of America account into his personal Bank of America account or depositing pool participant funds directly into his personal Bank of America account.

8

29. During the Relevant Period, Rhodes used approximately $1.27 million misappropriated from pool participants to pay for his personal expenses and to pay fictitious profits to pool participants and others.

30. Rhodes used pool participant funds to pay for his personal expenses, including payments for luxury cars, credit card bills, private school tuition, and mortgage payments. Rhodes never disclosed to pool participants that their funds would be, or had been, used for these purposes.

31. During the Relevant Period, Rhodes paid pool participant funds totaled at least $350,000. These funds were paid to both pool participants and individuals who had also provided Rhodes with funds for the purpose of trading E-mini S&P 500 futures contracts prior to the commencement of the Relevant Period. Rhodes did not disclose to the pool participants that he would use their funds for these purposes.

C. **Rhodes Commingled Pool Participant Funds**

32. Pursuant to Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2012), no CPO "may commingle the property of any pool that it operates or that it intends to operate with the property of any other person."

33. As described above, Rhodes misappropriated pool participant funds after the funds were deposited in his Bank of American bank account or in Lincolnshire's Bank of America bank account. The misappropriation occurred on the same day of the deposit or within days, weeks, or months after the funds were deposited in these accounts. Before the misappropriation occurred, however, Rhodes commingled pool participant funds by, among other things, transferring pool participant funds from Lincolnshire's Bank of America account

9

into his personal Bank of America account or depositing pool participant funds directly into his personal Bank of America account.

## VI. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

### VIOLATIONS OF SECTION 4$o$(1)(A) and (B) OF THE ACT, 7 U.S.C. § 6$o$(1)(A) and (B) (2006): FRAUD BY A COMMODITY POOL OPERATOR

34. The allegations set forth in paragraphs 1 through 33 are re-alleged and incorporated herein by reference.

35. Section 4$o$(1) of the Act, 7 U.S.C. § 6$o$(1) (2006), in relevant part, makes it unlawful for a CPO, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly: (A) to employ any device, scheme, or artifice to defraud any participant; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any participant.

36. During the Relevant Period, Rhodes acted as a CPO by soliciting, accepting, and receiving funds for the purpose of trading in commodities for future delivery on or subject to the rules of any contract market.

37. During the Relevant Period, Rhodes violated Section 4$o$(1)(A) and (B) of the Act, 7 U.S.C. § 6$o$(1)(A) and (B) (2006), in that while acting as a CPO he directly or indirectly employed a device, scheme, or artifice to defraud pool participants or prospective pool participants, and engaged in transactions, practices, or a course of business which operated or operated as a fraud or deceit upon pool participants or prospective pool participants by using the mails or other means or instrumentalities of interstate commerce. The fraudulent acts include, but are not limited to, the following: (1) misappropriating pool participant funds; (2) soliciting

investments through fraudulent misrepresentations about Rhodes' past and current trading performance; (3) falsely reporting Rhodes' rate of return and value of non-existent pool shares to at least two pool participants; and (4) issuing false statements to at least one pool participant.

38. Rhodes engaged in such acts by use of the mails or other means or instrumentalities of interstate commerce.

39. Rhodes engaged in the acts and practices described above willfully, knowingly or with reckless disregard for the truth.

40. Each misappropriation, misrepresentation or omission of material fact, and issuance of a false statement by Rhodes during the Relevant Period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006).

## COUNT TWO

### VIOLATION OF SECTION 4m(1) OF THE ACT, 7 U.S.C. § 6m(1) (2006): FAILURE TO REGISTER AS A CPO

41. The allegations set forth in paragraphs 1 through 33 are re-alleged and incorporated herein by reference.

42. With certain exemptions and exclusions not applicable here, all CPOs are required to be registered with the Commission pursuant to Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

43. Rhodes acted as a CPO during the Relevant Period in that he accepted and received funds from pool participants for the purpose of trading commodity futures contracts. In connection with such conduct, Rhodes used the mails or other means or instrumentalities of interstate commerce, directly or indirectly, to engage in his business as a CPO.

44. Rhodes engaged in the activities described above without the benefit of registration as a CPO, in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

45. Each use of the mails or any other means or instrumentality of interstate commerce in connection with Rhodes' business as a CPO without proper registration during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

### COUNT THREE

### VIOLATION OF COMMISSION REGULATION 4.20(c), 17 C.F.R. § 4.20(c) (2012): COMMINGLING OF POOL PARTICIPANT FUNDS

46. The allegations set forth in paragraphs 1 through 33 are re-alleged and incorporated herein by reference.

47. During the Relevant Period, Rhodes violated Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2012), by commingling funds received from pool participants with his own funds by, among other things, transferring pool participant funds directly into his personal bank account and never using pool participant funds for trading in commodity futures, on their behalf or otherwise.

48. Each instance of improper receipt and commingling of pool participant funds, including but not limited those specifically alleged herein, is alleged as a separate and distinct violation of Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2012).

### VII. RELIEF REQUESTED

WHEREFORE, the CFTC respectfully requests that this Court, as authorized by Section 6c of the Act, as amended, 7 U.S.C. § 13a-1 (2006 & Supp. IV 2011), and pursuant to its own equitable powers, enter:

A.  An order finding that Rhodes violated Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C. § 6*o*(1)(A) and (B) (2006);

B.  An order finding that Rhodes violated Section 4m(1) of the Act, as amended, 7 U.S.C. § 6m(1) (2006);

C.  An order finding that Rhodes violated Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2012);

D.  An order of permanent injunction prohibiting Rhodes and any other person or entity associated with him from engaging in conduct in violation of Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C. § 6*o*(1)(A) and (B) (2006);

E.  An order of permanent injunction prohibiting Rhodes and any other person or entity associated with him from engaging in conduct in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006);

F.  An order of permanent injunction prohibiting Rhodes and any other person or entity associated with him from engaging in conduct in violation of Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2012);

G.  An order of permanent injunction prohibiting Rhodes, and any other person or entity associated with them, from directly or indirectly:

   1. Trading on or subject to the rules of any registered entity, as that term is defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a (2006 & Supp. IV 2011);

   2. Entering into any transactions involving commodity futures, swaps, options on commodity futures, commodity options (as that term is defined in Commission Regulations 1.3(hh) and 32.1(b)(1), 17 C.F.R. §§ 1.3(hh)

13

and 32.1(b)(1) (2012)) ("commodity option"), security futures products, and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) (2006 & Supp. IV 2011) ("forex contracts"), for their own personal or proprietary account or for any account in which they have a direct or indirect interest;

3. Having any commodity futures, swaps, options on commodity futures, commodity options, security futures products, and/or forex contracts traded on their behalf;

4. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, swaps, options on commodity futures, commodity options, security futures products, and/or forex contracts;

5. Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, swaps, options on commodity futures, commodity options, security futures products, forex contracts, and/or retail commodity transactions;

6. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012); and

      7.      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2012)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012);

H.    An order directing Rhodes, as well as any of his successors, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts and practices which constitute violations of the Act and Commission Regulations, as described herein, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

I.    An order requiring Rhodes, as well as any of his successors, to make full restitution, pursuant to such procedure as the Court may order, to every pool participant or other person or entity whose funds were received or utilized by him in violation of the provisions of the Act and/or Commission Regulations, as described herein, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

J.    An order directing Rhodes, as well as any of his successors, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between him and any of the pool participants whose funds were received by Rhodes as a result of the acts and practices which constitute violations of the Act and/or Commission Regulations, as described herein;

K.     An order directing Rhodes, as well as any of his successors, to pay civil monetary penalties under the Act, to be assessed by the Court, in amounts of not more than the higher of: (1) triple the monetary gain to Rhodes for each violation of the Act and/or Commission Regulations; or (2) $140,000 for each violation of the Act and/or Commission Regulations committed on or after October 23, 2008; (3) $130,000 for each violation of the Act and/or Commission Regulations occurring during the Relevant Period before October 22, 2008, plus post-judgment interest;

L.     An order directing Rhodes, as well as any of his successors, to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2006); and

M.     An Order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated: 9/19/12

Respectfully Submitted,

By: *[signature]*
Traci L. Rodriguez, (*trodriguez@cftc.gov*)
Federal Bar No. DC 490635
John Einstman
Paul G. Hayeck
U.S. COMMODITY FUTURES TRADING COMMISSION
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
P:  (202) 418-5000 (Main)
P:  (202) 418-5980 (Rodriguez direct dial)
F:  (202) 418-5124

ATTORNEYS FOR PLAINTIFF
UNITED STATES COMMODITY
FUTURES TRADING COMMISSION